Now we got a full court. Okay. All right. We have Judge Wynn, Judge Floyd, and myself, Judge Niemeyer, and we're prepared now to hear the case of Baten v. McMaster, and we have Mr. Rosen and Mr. Limehouse. Is that right? You're both ready to proceed? Yes, Your Honor. Great, Your Honor. All right. Why don't we start with Mr. Rosen, and we'll hear from you. Good morning, Your Honors. Max Rosen for the plaintiffs, and may it please the court. Your Honors, if South Carolina used a winner-take-all at-large election to elect its entire state Senate, guaranteeing a one-party government and likely foreclosing the election of even a single senator supported by the state's African-American minority, the problems with that system under the Voting Rights Act and the 14th Amendment would be readily apparent. At minimum, a legal challenge to such a system would not fail at the outset on the pleadings. The use of winner-take-all to elect nine electors in South Carolina's presidential election is not different. It is an electoral decision by South Carolina that is not required by the Elector Clause or the Constitution and is subject to the same Voting Rights Act and 14th Amendment standards as any state election. I'd like to specifically focus my argument today on the Voting Rights Act claim and the 14th Amendment claim. And I'd like to begin... Let me ask you this. Is that because your one-person, one-vote claim is precluded by Williams v. Virginia State Board of Elections? No, Your Honor. The 14th Amendment claim here includes two components, a one-person, one-vote claim based on Gray v. Sanders, footnote 12, a second holding that was not addressed in Williams, and it includes a dilution claim based on the fact that the nine electors are elected at-large in a slate election that is also not precluded by Williams. Both aren't precluded by Williams. It is correct, though, Your Honor, that this Court has specifically said in the past in Republican Party v. Martin that a dilution claim is not covered by a one-person, one-vote summary affirmative. But I'd like to begin, Your Honors, by specifically discussing the First Circuit's recent decision on the 14th Amendment claims in Lyman v. Baker. Specifically because the First Circuit, although it ultimately rejected those claims, correctly articulated a number of relevant principles of law that apply here today and demonstrate why this Court should reverse. The First Circuit agreed that an election for electors is subject to restriction under the 14th Amendment and the Equal Protection Clause. It agreed that those restrictions go beyond the formal, quote, prohibition on casting a ballot, unquote, stating that, quote, there is no question that multi-member apportionment schemes can violate the dictates of the Equal Protection Clause if, by design or impact, they dilute the voting strength of political elements of the population. It did not dispute that it would likely be, quote, unconstitutional for Massachusetts to provide for the election of its state senators using a single-slate, at-large, winner-take-all election because it would result in one-party rule. And finally, it agreed that the Supreme Court decisions on the Equal Protection Clause context, like in the Bostick case, have, quote, developed a voting rights case law with respect to the use of multi-member districts since, Your Honor, the Williams decision in 1968. Having correctly articulated these general principles, many of which the state disputes, the First Circuit ultimately rejected the 14th Amendment claim on the basis of narrow Your Honors, if I may, I'm going to proceed now specifically to the Voting Rights Act claim, and I will explain why. This circuit should reverse the district court, although the First Circuit chose not to. Beginning with the Voting Rights Act claim, there's no question that there was no Voting Rights Act claim in the First or the Fifth Circuit, and that applying clear Fourth Circuit precedent on the contours of such a claim, at minimum, this court must reverse on the Voting Rights Act claim. The district court's sole basis for dismissing Plaintiff's Voting Rights Act claim was that the Voting Rights Act just doesn't apply to presidential elections. The state doesn't defend that position on appeal and indeed never argued that position to the district court. Applying clear standards that exist, the jingles factors, the totality of the circumstances test, there's no question that on the pleadings, the Voting Rights Act claim must go back. The state doesn't really dispute that plaintiffs have alleged this three jingles factors. Its only argument is that this court should dismiss the claim because, as isn't disputed, there is substantial overlap in this case between partisanship and race. And of course, the Voting Rights Act applies to race, not to partisanship. But while the state is ultimately free to make that argument in the context of a totality of the circumstances analysis, once this case goes back to the district court, it is simply not right for a decision here. As this court held in United States v. Charleston, the distinction between partisanship and race and the overlap between the two, although relevant, arises in the context of the totality of the circumstances analysis, an analysis that postdates the jingles threshold inquiry, is for the trier of fact, and turns on very specific particularized analysis. In contrast, the Fifth Circuit case that the state cites, Lulac v. Clemens, dealt with partisanship differently. It put that into the threshold jingles analysis on the third factor, believing it was more relevant ultimately to the test. And in any event, Lulac provides the state no support here, because that was a decision after a trial. And indeed, plaintiffs in that case specifically argued it would be dangerous for a court to overlap between partisanship and race, when both a racial dilution and a partisan dilution claim might be cognizable, precisely because it would eliminate meritorious claims. And in response, the Fifth Circuit expressly held, and I quote, plaintiffs are entirely correct in maintaining that courts should not summarily dismiss vote dilution claims in cases where racially divergent voting patterns correspond with partisan affiliation. That's the Lulac decision at pages 860 to 861. In other words, your honors, applying clear Fourth Circuit precedent, the United States v. Charleston case, to the election for electors, which is covered by the Voting Rights Act no less than an election for judges would be, as the Supreme Court has repeatedly stated, and this circuit held in Republican Party v. Martin, this court must at a minimum allow plaintiffs to develop that claim before the district court. Turning to the 14th Amendment claim, your honors, plaintiffs brought two 14th Amendment claims, a dilution claim and a one-person, one-vote claim. In brief, the claims are that the election for electors is effectively an at-large slate election that dilutes the votes of political minorities and contravention of standards established in cases like Rogers v. Lodge and Whitcomb v. Chavez and White v. Register. Again, the First Circuit's analysis is instructive in this regard. The First Circuit agreed that there is no question that multi-member apportionment schemes can violate the dictates of the Equal Protection Clause if, by design or impact, they dilute the voting strength of political elements of the population. It also agreed that the analogy to a slate election for the entire state Senate, which would undoubtedly be a problematic power grab by a majority party using a dangerous electoral mechanism, the slate at-large winner-take-all election, would likely be unconstitutional. It only distinguished this problematic analogy by pointing out that electors are not deliberative. But in this regard, the First Circuit and the Fourth Circuit differ. Turning the court to the Republican Party of North Carolina v. Martin case, in that case, this court explicitly held, or rejected the position, excuse me, and I quote, that the position occupied by an elected official bears on the protection afforded by the Equal Protection Clause. In other words, that a dilution claim is cognizable against a judge, against an elector, that it turns on the way that the at-large slate mechanism is used to dilute the strength of political minorities. This circuit should disagree with the First Circuit and, indeed, embrace the analogy that winner-take-all is no more permissible here than it would be in the context of that state election. Your Honors, I wanted to turn quickly to Williams, because Your Honor specifically raised it, Judge Floyd. On the Williams decision, both the Fifth and the First Circuits, indeed, agreed that as to the 14th Amendment, the Williams decision specifically precluded plaintiff's 14th Amendment argument. Now, neither the First Circuit nor the Fifth Circuit had a Voting Rights Act claim, and there's no question Williams did not address a Voting Rights Act claim, and that that claim is in no way affected by Williams. But it's also the case that the 14th Amendment, both, 14th Amendment claims, both premised on dilution law and premised on the second holding, which the First Circuit acknowledges a second holding in Gray v. Sanders, footnote 12, survived Williams. And Your Honors, here I would point out that there are significant distinctions between how this circuit approaches summary affirmances and how those are approached in the First and the Fifth Circuits. This circuit has repeatedly refused to read summary affirmances broadly in two regards. One, to foreclose arguments that were not made or explicitly addressed in those summary affirmances. And two, when evolving equal protection cost precedent demonstrates that those claims require a new analysis. The court has articulated those principles in two cases, Republican Party of North Carolina v. Martin, where it repeatedly refused to defer to a summary order, both distinguishing one person, one vote, and dilution claims, stating that a First Amendment claim that was never raised to the Supreme Court could not be foreclosed by that decision, and generally stating that summary affirmances shouldn't necessarily hold weight precisely because they can be reconsidered. And in Bostic v. Schaeffer, addressing the gay marriage summary affirmance, Baker v. Nelson, this circuit, unlike the First Circuit when presented with the same question, noted that major equal protection cost decisions postdated Baker and undermined its weight. Your Honor, given these distinctions, we would ask this circuit in particular to be hesitant to foreclose 14th Amendment claims that indeed could be viable if they proceed past the pleadings on the basis of the Williams decision. And there I would point to the fact, specifically, that as to the dilution claim, the Williams decision predated cases like Rogers v. Lodge, White v. Register, and Whitcomb v. Chavez, that develop dilution law and that provide the exact standard on which plaintiffs rely here, cases that this court in the Duckworth decision, which I cited in my recent letter, has made clear provide an analogy to political dilution claims. And second, as the First Circuit itself made clear, Gray footnote 12, the second holding that explains how winner-take-all at the first step of a two-step election discards votes, is not cited or addressed in Williams. In conclusion, Your Honor, just as a high-level summary, plaintiffs have under clear standards that the First Circuit embraced applied, made clear or alleged a Voting Rights Act claim, and they have alleged a 14th Amendment claim, and they have made clear that Williams should not be a barrier to these claims, which have never been addressed, which were not addressed in Williams and should not be foreclosed by Williams. As this court stated in Wright v. North Carolina, a 2015 decision, Rule 12b6 dismissals are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development. That statement clearly applies both to the Voting Rights Act claim and the 14th Amendment claim, and this court should at minimum allow plaintiffs to develop that theory and those facts before the district court in order to ultimately prove their claims. Thank you. I'd like to reserve the remainder of my time for rebuttal. Yes, Your Honor. Let me ask you one question. The Jingles structure assessed the allocation of voting among multi-districts, which permitted a manipulation of how the votes are valued. Here, we don't have multiple districts. We have one ultimate political unit, the state. And does that make a difference? No, Your Honor, because the Constitution actually doesn't. It sounds to me like if it's one ultimate unit, then the question is, is it nothing more than just a majority vote? Everybody's vote counts the same, but you end up with more votes one way than the other. And, Your Honor, I would point Your Honors to the Constitution, which the state invokes the Elector Clause as protecting its decision. In fact, the one requirement the Constitution does have is that South Carolina hold a vote for nine electors, that it has to do that, no fewer, no more, and it has to elect those nine individuals. The Constitution itself contours this at minimum as a multi-member election, and it would violate the Constitution to not understand that the Voting Rights Act can apply to that multi-member election. Thank you, Your Honors. I'll reserve the remainder of my time for rebuttal. All right, thank you. All right, we'll hear from Mr. Limehouse. Thank you, Your Honors. May it please the Court. Thomas Limehouse on behalf of the Court. This matter comes before the Court as part of a multi-state challenge to the predominant method of appointing presidential electors. The plaintiffs ask this Court to do two things that no one has done before. First, rule in their favor, and second, design and require a state to adopt a purely proportional approach to appointing presidential electors. Plaintiffs claim that the Constitution prohibits South Carolina from using a method of appointing electors that dates back to the first presidential election following ratification of the Constitution, and that is currently used in all but two states. In doing so, plaintiffs ignore two centuries of electoral practice, binding Supreme Court precedent, and present claims that are neither novel nor plausible, and have offered no valid justification for deviating from settled law to consider what amounts to generalized partisan grievances, much less any explanation as to how the federal court should go about designing a proportional system that isn't used by any state in the Union. Whereas here, the Constitution expressly grants state legislatures the authority to determine the manner of appointing presidential electors, this Court should be skeptical of a request to impose a remedy that plaintiffs acknowledge doesn't currently exist. At bottom, plaintiffs' claims lack merit, and as the Supreme Court recently noted in Rucho, this Court lacked subject matter jurisdiction to entertain a claim that is based purely on pleas for proportionality. Therefore, this Court should remand with instructions to dismiss for lack of jurisdiction, or alternatively well-reasoned decision in granting the prior motion to dismiss the plaintiff's complaint with prejudice. First, as to justiciability, Article II, as I mentioned, expressly authorizes each state to appoint presidential electors in such manner as the legislature thereof may direct. The Supreme Court has described this specific textual grant as providing states exclusive authority and plenary discretion on the manner of appointment. The Supreme Court recognized in Bush v. Gore that there is no federal constitutional right to vote for electors for President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the Electoral College. Of course, once a state provides for this manner of appointment, Bush noted that it can be exercised in a way that violates other specific provisions of the Constitution by later arbitrary and disparate treatment, valuing one person's vote over that of another. To be clear, we do not submit that a state's plenary authority to dictate the manner in which presidential electors are appointed is, in all cases, beyond the realm of judicial review. On the basis of McPherson, Williams v. Rhodes, Williams v. Virginia, and Bush v. Gore, the Government Master did not challenge subject matter jurisdiction below. However, after plaintiffs noticed the incident of appeal and after they filed their opening brief, the Supreme Court issued its opinion in Rucho, which makes clear that claims which invariably sound in a desire for proportional representation leave the realm of the justiciable and enter the realm of the political. Such is the case here, where plaintiffs asked this Court not only to declare unconstitutional the method used by 48 states and the District of Columbia, but also to take the unprecedented, creating and imposing a proportional approach used by any other state. In the two states that don't use the winner-take-all method, plaintiffs have acknowledged in their complaint and also in oral argument, I believe, in the Fifth Circuit that they take issue with that approach as well. Rucho establishes such pleas for proportionality pose inherently political questions and fundamental constitutionals prevent the plaintiffs from converting what are essentially policy arguments into cognizable legal claims. For these reasons and those outlined in the Governor's Motion to Dismiss and Merits Brief, we would submit that the Court should not proceed to address the merits of plaintiff's claims on the basis of hypothetical jurisdiction. Also, Rucho raised an additional threshold defect to plaintiff's claims, and that is the lack of Article III standing to maintain the present challenge. Now, to be sure, the question of whether plaintiff's claims have carried, plaintiffs have carried their burden of establishing an injury, in fact, that is traceable to these defendants and likely to be redressed by a favorable decision necessarily involves some interplay, if not overlap, with the merits of plaintiff's claims. However, as noted in Rucho, federal courts are not responsible for vindicating generalized partisan preferences. Accordingly, we respectfully submit that in light of the Supreme Court's decision in Rucho, which addressed and rejected a similar quest for proportionality, this Court can and should vacate the District Court's order and remain with instructions dismissed for lack of jurisdiction. Assuming we don't take that posture, given the direct opinions of McPherson and Williams and the lack of language to see it directly overruled, what would be your position, particularly on the, speak, if you will, to the First Amendment and to the Voter Rights Claim here? Yes, sir. First, I would take the position that the First Amendment claim, one, is likely foreclosed by Williams, although not directly addressed, and note that at least that claim I don't believe was directly raised at the, before the three-judge panel in Williams. Williams repeatedly noted that the, what they referred to as the unit rule or unit method did not disturb the Constitution, not unlawful, and nothing in the unit rule is offensive to the Constitution. However, even if the Court were to conclude that Williams does not foreclose Plaintiff's First Amendment claim directly, it certainly does so derivatively, as the Court noted in Republican Party of North Carolina v. Martin, a First Amendment voting rights claim cannot proceed separate and apart from a viable Fourteenth Amendment claim. So Williams was a, Williams was a summary of Furman's case. Yes, sir. Do you agree that as a basis to foreclose a First Amendment claim? If not directly, at least derivatively, because of the Fourth Circuit's prior ruling in Republican Party of North Carolina v. Martin, which makes clear that if there is no Fourteenth Amendment voting rights claim, there can be no derivative First Amendment voting rights claim. Well, are the First Amendment raised or even addressed in the Williams case? I'm sorry, Your Honor, what was that? First Amendment. Was that even raised or addressed in that case? No, sir. Other than the comments, generally, I mentioned that the Court noted that it was not, did not disturb the Constitution, was not offensive in any way, and was not unlawful. So that, you'd have to admit, that would be a little stretch, wouldn't it? I mean, just not be argumentative, I mean, it sounds like it's a bit of a stretch to say it's derivative from something neither raised nor argued in the case. And then you've got the voting rights claim, was that foreclosed by Williams too? I think that is foreclosed on its own terms, as well as, you know, the persuasive application of Williams to that, because as the District Court noted below, to the extent you can even apply the Voting Rights Act framework to this case, the only logical way to do it would be to look to the one-person, one-vote principles, which were addressed in Williams. However, we would submit that the Voting Rights Act does not apply cleanly to the Electoral College scenario. Would you also agree that, at least insofar as Rucho, even if it does, if it were to reach the area you want it to, it wouldn't foreclose a voting rights claim on just disability? As a general rule, I would agree with that, except to the extent this is purely a matter of proportionality, and the Court made fairly clear that, you know, it is not the purview of federal courts to mete out those issues of fairness in the political realm. Does the State take the position that the Voting Rights Act does not apply to presidential elections? We have not taken that position affirmatively, but would acknowledge that it is certainly an open question as to whether or not it applies. I don't believe plaintiffs have cited a single case that says it does, and that we would vote, particularly as it relates to plaintiffs' proposed remedy, in 1980 Congress amended the Voting Rights Act to specifically provide that it did not require proportional representation. Was that what the District Court held, that it didn't apply? It's not entirely clear, Your Honor. I think the District Court just applied the one-person, one-vote principles and seemed to suggest that it may not necessarily apply, but that even if it did, they did not state a cause of action. Tell me what the State has done to deny or abridge voters' rights in this case as it relates to Section 2. What action have they done abridges or denies the right to vote? I can't point to anything, Your Honor. There is certainly no action that has been taken that has denied anyone the opportunity to cast a vote in the same sense as anyone else, and it is that opportunity that the Voting Rights Act is designed to address. Is there anywhere in Section 2 that suggests that we should protect the guarantee of electoral success? No, sir, Your Honor. There is nothing in the text of Section 2 of the Voting Rights Act, nor in the case law pressing it, in fact, the specific case law to the contrary, that neither the Equal Protection Clause nor the Voting Rights Act are designed to ensure electoral success, just opportunity to participate in elections in the same terms as everyone else, and that is precisely what is the case in this circumstance. Your Honor, going back, as I said, to the 14th Amendment claims, we would note the District Court agreed here with all of the other District Courts that have considered this issue in noting, as I mentioned a moment ago in the context of the Voting Rights Act, the winner-take-all system complies with equal protection because it does not inherently favor or disfavor any particular group of voters. Every District Court to consider the question has found as much, and the First and Fifth Circuits have since joined the chorus in rejecting plaintiffs' assertions to the contrary. As it relates to the Fifth Circuit's opinion, that is the only one of the companion cases in which the plaintiffs raised a Voting Rights Act challenge, and the Fifth Circuit noted that the plaintiffs in that case expressly abandoned the Voting Rights Act challenge. Although the plaintiffs here seek to invoke Gray to circumvent the preclusive effect of Williams in the context of the 14th Amendment claim, their argument fails right out of the gate because the Supreme Court has expressly recognized that the issues addressed in Gray were in a positive to the Electoral College system, and both the three-judge court and the Supreme Court in Williams were well aware of Gray, which was decided before Williams and relied upon by the plaintiffs in that case. And as Gray typically said, that any analogies to the Electoral College are in a positive. So the notion that Gray, the court in Gray, slid in a separate and distinct holding in a 12-foot note while noting that any analogies to the Electoral College are in a positive, we would submit as a stretch in trying to make that case that it is, gives it a second and distinct cause of action under the Equal Protection Clause. In any event, South Carolina's winner-take-all system plainly comports with the Equal Protection Clause because it gives all who participate an equal vote and does not inherently favor or disfavor any group. And in fact, the plaintiffs in this case had the right to vote and did vote in the elections about which they now complain, and nothing about the winner-take-all system infringed upon or frustrated that right. And South Carolina's winner-take-all method neither discards votes nor dilutes voting strength. As the Supreme Court noted in McPherson in addressing similar issues initially and dismissing similar non-representational arguments, the Constitution contains an express textual commitment of exclusive authority to state legislatures to determine how to appoint presidential electors. And in cases where, as here, each citizen has an equal right to vote, the same as any other citizen, no discrimination is made. Thus, plaintiffs' one-person, one-vote system necessarily fails as a matter of law. With respect to the First Amendment claims, as noted, this Court's opinion in the Republican Party of North Carolina v. Martin plainly forecloses any derivative First Amendment claim and notes that it cannot be brought where there is not a valid 14th Amendment claim for voting rights as well. As the District Court in this case quickly identified, plaintiffs' argument here conflates a diminishing motivation to participate with a severe burden on the actual ability of people to participate in the voting process. To be sure, the winner-take-all method sets fairly high stakes of the electoral process, but it does not deprive any group of voters of the ability to participate in that process. Plaintiffs here have failed to articulate any burden to their associational rights. As such, this Court, like the First Circuit, need not decide which of the various tiers of scrutiny would apply to any balancing of burdens or interests. Additionally, as noted previously, we submit that Williams controls for the reasons outlined in the Republican Party of North Carolina v. Martin and that there cannot be a separate derivative First Amendment claim. The Constitution does not provide a right to or a guarantee of effective association, persuasive speech, or influential advocacy, much less political success at the polls. Therefore, this Court should affirm the lower court's dismissal of plaintiff's second call of action under the First Amendment. Just on the First Amendment, the burden, as I understand it, as being alleged is because of the way the system is set up. You wouldn't get a party, in this instance, the Democratic Party, if things flipped over, would go the other way. No major candidates are going to come to a state with a situation like this, where the winner-takes-all. And because of that, they don't have an opportunity to interface and petition those parties. In other words, if the major candidates for the other party don't come to South Carolina, and in fact, the major candidates win the election, I guess, or whatever, or even in articulating their position, basically the South Carolina voters don't matter. Because they just don't have an opportunity to talk to major candidates. And that would be true in states where the reverse would be the case. It's not a Republican-Democrat. It's just a matter of who's in charge and who's more likely to win. So that argument applies in states where the opposite occurs, too. And so that's the level of the burden here, as I understand it, for the First Amendment perspective. And I certainly understand that argument. I don't know that I would concede that that is a cognizable burden, much less one that would not be easily outweighed by the state's regulatory interest in elections. But I would note, at least for South Carolina, it can hardly be said that South Carolina has not been important to the Democratic Party and that Democratic candidates have avoided South Carolina by any means. But more so, the converse argument could also be made, and in fact, was made by Thomas Jefferson in deciding, as noted in Williams, and I believe McPherson as well, why it was necessary for Virginia, why he suggested that Virginia adopt the winner-take-all method to avoid a dilution of votes within the state so that the state's block of votes no longer counted with or carried as much weight at a national level. Because when other states... It makes sense, I mean, but about following what the converse of it is in terms of being able to have an influence as a burden on the party, the members of the party who is not predominant, the burden on them, they don't have a say-so in terms of policy for practical purposes. I mean, you don't have to pay those... You basically just avoid South Carolina. There's no need to go there. Well, again, certainly I understand the argument, but I think that presupposes that there is, and Plano does presuppose throughout their papers, that there is this national election for president. That's not the case under the Constitution by its terms, but it's difficult to sort of carry out this hypothetical because it's purely a hypothetical because this proportional system is not used in any state. But you can certainly imagine a scenario under which if numerous states were to adopt or as Plano has imposed judicially, a proportional method of appointing electors, then it would essentially be a national popular vote such that candidates would not skip individual... They would have even less of a motive to come to South Carolina if there are less votes on the table. So I think that argument, to the extent Plano has asserted that as a burden, it is far from clear and would easily be outweighed by any regulatory interest in elections and by the very interests that were noted in the Williams opinion by the three-judge panel and the very state interests that were cited by Thomas Jefferson at the time, which is evidenced by the fact that 48 states in the District of Columbia have found that interest sufficient enough to adopt it as well. Of course, the question here is whether when you say something is outweighed, the question is, is it too early for us to make that decision as to whether it is outweighed? I mean, that seems like a question for the District Court to consider. If the plaintiffs had stated a cause of action, I might concede that. Instead, what they did is essentially prematurely attempt to shift the burden. If they had stated a viable and plausible cause of action under the First Amendment and asserted a cognizable burden of any associational rights under the First Amendment, it might have been necessary for the District Court to weigh those burdens. But like the First Circuit noted in their opinion, the District Court need not reach that question, and neither does the Court of Appeals, because they have failed to state any cognizable burden of their First Amendment rights. In concluding... Yeah, you have something further? Yeah, just to quickly conclude, Your Honor, at bottom, the Supreme Court has repeatedly recognized that our political system necessarily involves winners and losers. The same premise applies to the winner-take-all method used in 48 states, and the fact that plaintiffs' votes have not translated into success does not convert their political grievance into a Constitutional or Voting Rights Act violation. Although plaintiffs contend that the losing side should receive proportional representation in the Electoral College, their partisan policy preferences find no textual basis in the Constitution, and plaintiffs' prayer for relief likens presidential electors to partisan participation trophies. However, a state cannot be required to appoint presidential electors in a particular proportional manner simply to ensure that voters whose preferences are not shared by a majority or a plurality of their fellow voters are not discouraged from trying again next time. For these reasons, and those stated in the Governor's motion to dismiss, and in the joint brief submitted to this Court, we would submit that this Court should join every other Court to consider the same or similar challenges and promptly dispose of this matter, whether by remanding with instructions or affirming the District Court's dismissal of plaintiff's complaint. Thank you. Thank you. All right. Mr. Rosen? Thank you, Your Honor. First, I want to briefly address the questions in the Voting Rights Act. First, we absolutely cited a case that demonstrates the Voting Rights Act applies to the presidential election. Williams v. Rhodes, which makes clear the 15th Amendment, which is the basis and authority for the Voting Rights Act, applies to the presidential election. That's likely why the state has never contested that the Voting Rights Act absolutely applies to a state's decisions under the Elector Clause how to contour its elections. Second, Your Honors, ask specifically why it is that there is a Voting Rights Act claim, and why it is specifically that voters are not treated equally. The answer is look at United States v. Charleston, which lays out specific factors for determining whether voters are treated equally in the context of a Voting Rights Act claim. Those factors absolutely include, as an initial matter, some discussion of proportionality. To quote Hall v. Virginia from this circuit, whether the minority has, quote, the opportunity to exercise an electoral power that is commensurate with their population in the relevant jurisdiction, end quote, is a key inquiry of the initial jingles threshold factors. That's what we're looking for. And here we have a multi-member election for multiple electors. And indeed, an African-American community in South Carolina, as a result of winner-take-all, has not elected a single elector in more than 40 years since Jimmy Carter. And if you look at our complaint, there was a question, I believe, Judge Flynn, that you asked about whether or not there are allegations in the complaint that explain the Voting Rights Act claim. The answer is there are dozens that demonstrate the distinct effect of winner-take-all on the African-American minority in South Carolina. They point to a history of disenfranchisement. They point to different outcomes in the political process and a failure to elect candidates at the state level. And they specifically point to the way that winner-take-all, in particular in the 1948 election in South Carolina, where South Carolina gave all of its votes to Strom Thurmond, was particularly used in the context of racial voting. On the pleadings, this is absolutely enough to state a claim that because of winner-take-all and the fact that it guarantees in South Carolina the white majority, all of the electors in every election, that under these clear and applicable standards, we have stated a Voting Rights Act claim. If the state wants ultimately to argue this is just about partisanship or to question whether clear jingles factors can be outweighed in the totality of the circumstances analysis, it can do so. But it should not be permitted to do so on the pleadings. To turn as well to the First Amendment claim, which, Judge Wynne, you asked about. First, there's no question that Williams' decision did not foreclose the First Amendment claim. That's absolutely correct. The First Circuit hasn't held as much. The Fifth Circuit hasn't held as much. And indeed, in Republican Party versus Martin, which we and the state have both cited, the court explicitly held that when a First Amendment claim wasn't addressed by a summary affirmance, it wasn't foreclosed. Second, Your Honors also spoke about whether or not we can measure whether candidates are ignoring South Carolina because of winner-take-all and whether the effect is Democratic candidates don't take seriously the interests of the Democratic minority in South Carolina, that they don't have any influence over national politics, that because of winner-take-all, not only their votes, but also their voices are silenced. And the answer is, again, we know that. The states, in response to that question, contested the factual premise that, in fact, candidates are ignoring South Carolina. That's not an appropriate thing to do on a motion to dismiss. And if you look at paragraph 60 of our complaint, we have clearly alleged that this incentive structure works exactly as intuitively you'd think it would, that candidates indeed ignore South Carolina. I would also point out that this incentive framework is indeed relevant to the First Amendment analysis. In Rhodes, Justice Harlan, in his concurrence, spoke specifically about how basic incentives can be altered by electoral frameworks and how that can be a problem. In Arizona Free Enterprise Club, the Supreme Court decision from 2011, we saw, again, how incentive structures, not just formal voting prohibitions, can indeed be relevant under a First Amendment. Did you allege facts in the complaint sufficient to make a cognizable claim under the First Amendment? We did, Your Honor. We allege that candidates are ignoring South Carolina. We also allege numerous facts that are overlapping between the 14th and First Amendment claims that generally demonstrate that because of winner-take-all and because of the artificial structure created by winner-take-all, minorities in South Carolina are unable to have a voice in these elections, unable to elect a single elector, and that that's widely understood. But indeed, Your Honor, turning to final- Let me ask you something. You know, I thought about the last election and candidate Hillary Clinton refused to go near the election to the upper Midwest because she thought she was ahead in those places and the winner would take all. It seems to me candidates could avoid states on the opposite conclusion. They won't go to- A Democrat today might not go to California because they count on California. And a Republican doesn't go to California because they don't get California. It's a dicey thing to start sorting all that out. Your Honor, that might ultimately be what the state can prove on the facts. But this speculation about the facts that contravenes allegations in the complaint on the First Amendment claim- My question is not focusing on the facts as much as it's focusing on the theory. In other words, this may be just political discretion in campaigning and some candidate may think he can swing the state. There's nothing that precludes him from going to the state. And the candidates in today's communications get to see the candidates on television from every- People from every state get to see them. We're getting enmeshed a lot in the whole election process that's been going on for some years. And now there's been a lot of criticism by many people of the electoral college system. But it seems to me that this might be something that just goes along with that system. Can I briefly answer your question, Your Honor? Yes, please. Yeah, Your Honor, the factual theories, and I do believe they are factual theories about the way winner-take-all interacts with minority votes in the 14th Amendment context, the way it interacts with candidates and incentive structures in the First Amendment context, the way it affects minority rights in the Voting Rights Act context. These are indeed complex factual determinations. There can be a disagreement of opinion about it. And that's exactly why- My point is that there'll be so much disagreement as to why candidate A didn't go to South Carolina. It's a campaign decision based on time, money, effort, whether they're going to win or not. What are they contributing? In other words, the facts, it's a little bit like the weather. There's so many facts. You may not be able to state a basic cause of action on that type of claim. I'm just raising that as a possibility. Obviously, we take your allegations as true when we're on the 12v6. But I think the argument that South Carolina would make is that that's part of the political process that we can't review. And if I may answer that question, Your Honor. Well, I want to understand the context of the, at least the statements, because I agree that a candidate with Judge Niemeyer, a candidate could choose to not go to a state for any number of reasons. But it's not the First Amendment rights of the candidate we're thinking about. We're talking about the First Amendment rights of the individuals in the state. And for a candidate to choose not to go to South Carolina, because basically there's no chance you're going to win South Carolina and it's a one to take all, is a different thing than not to go to a state you think you're going to win for the voters there. It's obvious if you think you're going to win there, those voters are going to have some influence and you better feel very comfortable that you've had that influence and listened to their concerns in order to get that state. Whereas that doesn't exist in South Carolina. And it's the question of the burden that we're talking about here, that it bears upon those who wish to have First Amendment associational rights. And in this instance, the voters, as I understand it, from the First Amendment perspective are saying, we don't have that privilege that perhaps they have in Michigan, even though it may be a misconceived perception on their part. And they may in fact have had that, but it didn't matter if their candidate didn't win. And that would be true for the Republican candidate for South Carolina, that you would choose to go there. But if you lost, then those who thought they had influence won't have influence. So, but the question is, is why would one not choose to come there? Basically you ignore that. And having been in a number of statewide elections, I'm quite familiar with that. When you have a hundred counties and you feel like there's no chance you're going to win one of those counties, you do not go to that county. You do not spend time in sparsely populated county. That's one of the fallacies of perhaps judicial elections is terrible. But that goes through here. And just to keep it narrowly focused, the question really comes to the burden. And as your co-counsel pointed out, there's a weighing here to go on. And I'm not sure we're in a position to weigh that at this point, but it seems to me that it should be weighed, the burden of choices. Your Honor, if I may briefly make two points in response. I completely agree. And specifically, I believe the key point is that winner take all as a specific electoral mechanism is as we've alleged, the reason why candidates don't visit South Carolina, it's not because there aren't enough minorities to provide electors to those candidates. It's not because the state couldn't be competitive under alternative systems, including systems other states use now and used at the founding. It's because specifically of winner take all that in both the 14th and first and VRA context, these minorities are unable to have any electoral influence in the context of presidential elections. And it's just one final point. I agree. And I believe that this colloquy has revealed there are complicated questions here, both the fact and a theory, which is exactly why this circuit held in Wright versus North Carolina, that when a complaint sets forth a novel legal theory that can best be assessed, sorry, that for novel legal theories, they can best be assessed after factual development, precisely because we can better understand the way the incentive structures operate. We can better understand the historical intent and effect of winner take all. And ultimately, your honors, we can actually determine the questions that shouldn't be decided here. Thank you. All right. Thank you, Mr. Rosen. Ordinarily, as you guys know, we would come off the bench and come down and shake your hands. We're under a unique circumstance where we're foreclosing that. That was a tradition set by Judge Parker back in the 1930s. And we followed it. And I think we're the only court to follow it. And I think both lawyers and the judges like it. And I don't think we intend to eliminate it if we go back to oral argument in the courtroom, which I'm sure we will. But I do want to extend the greetings of the Fourth Circuit. And thank you for your arguments. We'll take this, of course, and consider it all. Have a good day. Be safe. And we'll return to you later with an opinion. Thank you, your honor. All right. We'll stand adjourned. Signing die. This audit report stands adjourned. Signing die. God save the United States and this honorable court.
judges: Paul V. Niemeyer, James A. Wynn Jr., Henry F. Floyd